**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

FAMIOUS WILLIAMS,          )
                           )
Plaintiff,                 )
                           )
vs.                        )          NO. 1:08-CV-240
                           )
CHAD HISSONG, et al.,      )
                           )
Defendants.                )

## OPINION AND ORDER

This matter is before the Court on: (1) Defendants Fecher's and Nichols' Motion for Summary Judgment (DE# 22), filed on June 19, 2009; (2) Defendants' Motion for Summary Judgment (DE# 26), filed by Defendants Chad Hissong, James Bragg, and Andrea Pettis, on June 30, 2009; and (3) Defendants' Motion to Strike (DE# 33), filed by Defendants Ron Fecher and Joe Nichols, on August 4, 2009. For the reasons set forth below, each of these motions are **GRANTED**. Accordingly, the clerk is **ORDERED** to enter judgment in favor of Defendants and against Plaintiff. The clerk is further **ORDERED** to close this case.

BACKGROUND

On October 16, 2008, Plaintiff, Famous Williams, filed a form

section 1983 complaint alleging various constitutional claims against Defendants, Chad Hissong, the principal at Elmhurst High School, James Bragg, the assistant principal at Elmhurst High School, Andrea Pettis, a teacher at Elmhurst High School, Ron Fecher, the university supervisor at IPFW, and Joe Nichols, the Chair of the Educational Studies Department at IPFW, arising out of the termination of his student teaching assignment at Elmhurst High School.

Defendants Fecher and Nichols have filed a motion for summary judgment, claiming that they are no genuine issues of fact and that they are entitled to judgment as a matter of law. They have also filed a motion to strike Plaintiff's designated materials in opposition to their motion for summary judgment.

Defendants Hissong, Bragg and Pettis have also filed a motion for summary judgment asserting that they, too, are entitled to judgment as a matter of law.


Facts

Plaintiff, Famous Williams, is a sixty-eight year old black male who, at all relevant times, was a student at Indiana University – Purdue University Fort Wayne (hereinafter "University"). (Pl. Dep. p. 16). In August 2005, Plaintiff began working towards his Teacher Certification; however, because he did not meet the University's requirements for student teaching, he was

advised that he was not yet eligible to student teach. (Pl. Dep. p. 16; Reynolds Decl. ¶ 18, Ex. A). In August 2006, Plaintiff applied for an Academic Fresh Start in order to allow him to qualify to participate in student teaching. (Reynolds Decl. Ex. A). The Academic Fresh Start was granted in November 2007, and Plaintiff was approved for the student teaching program to begin in the Fall of 2008. (Reynolds Decl. Ex. A).

When the student teaching assignment began, Plaintiff was placed as a student teacher at Elmhurst High School ("Elmhurst") in Fort Wayne, Indiana, for a ten-week period beginning August 18, 2008. (Pl. Dep. p. 166; Reynolds Decl. ¶ 19). Andrea Pettis ("Pettis"), a social studies teacher at Elmhurst, was assigned to be Plaintiff's supervising teacher. During the time Plaintiff student taught at Elmhurst, Chad Hissong ("Hissong") was the principal at Elmhurst and James Bragg ("Bragg") was the assistant principal.

Plaintiff was removed from his student teaching placement at Elmhurst during the eighth week, for failing to meet the University's minimum student teaching requirements, including maintaining an average of at least 2.5 on student teaching evaluations. (Pl. Dep. pp. 172, 174; Reynolds Decl. ¶¶ 21-22).


The Educational Studies Department at the University

The Educational Studies Department at the University offers

accredited programs to obtain a Bachelors of Science degree in Education. The goal of the student teaching program is "to provide the opportunity for acquisition and demonstration of instructional competence" and to allow student teaching candidates to strengthen their skills and knowledge as a teacher. (Pl. Dep. Ex. N at 1; Reynolds Decl. ¶ 5). The student teacher experience at the University involves three facets – a university supervisor, cooperating teacher, and the student teacher. (Pl. Dep. pp. 167-68; Ex. N, p. 1; Reynolds Decl. ¶ 8). The university supervisor serves as a link between the University and the cooperating school. (Pl. Dep. Ex. N, p. 10 Reynolds Decl. ¶ 8). This supervisor observes, evaluates, and confers with each student teacher and cooperating teacher. (Reynolds Decl. ¶ 9). If the student teacher's activities are not "conducive to effective learning," the student teacher must adjust his techniques. (Williams Dep. Ex. N, p. 10; Reynolds Dec. ¶ 7). If the student teacher fails to improve, he may be reassigned or withdrawn from placement. (Reynolds Decl. ¶ 15).

Two student teaching placement periods are required to be completed by the student, both a ten week placement and a six week placement. (Pl. Dep. Ex. N, p. 3; Reynolds Decl. ¶ 12). The University's guidelines require that a natural progression of increasing student teacher immersion takes place throughout the placement period, resulting in the student teacher assuming the

full responsibilities of a teacher.  (Reynolds Decl. ¶ 12).

Once the student has received a student teaching assignment, the student teaching candidate must contact the cooperating teacher and principal to set up a meeting.  (Pl. Dep. Ex. N, p. 4).  During the meeting, the student teaching candidate should become acquainted with the cooperating teacher, principal and school, pick up any relevant materials, set goals and expectations, and learn classroom rules and guidelines.  (Pl. Dep. Ex. N, p. 4).  The first two weeks of the student teaching placement comprise Phase 1, wherein the student teacher participates in school orientation and observation.  (Pl. Dep. Ex. N, p. 4).  Weeks three through nine comprise Phase 2, wherein the student teacher participates in classroom activity and leads student instruction.  (Pl. Dep. pp. 171-72; Ex. N. p. 3).  A "minimum of four weeks o full immersion is required to provide the experience necessary for the development of the student teacher."  (Pl. Dep. Ex. N, p. 6).  During week ten, which comprises Phase 3, the student teacher enters into a period of transition, observation, and reflection.  (Pl. Dep. Ex. N, p. 3).  The University recommends that 70%-75% of the total student teaching experience be represented by "Instruction" or "Full Teach." (Pl. Dep. Ex. N, p. 6).

A collaborative midterm evaluation takes place between weeks four and five, a midterm evaluation during week six, and a final evaluation during week ten.  (Pl. Dep. Ex. N, p. 6).  The

University requires a cumulative average numerical score on all official student teaching evaluations of at least 2.5 to pass each student teaching placement. (Pl. Dep. Ex. N, p. 2; Reynolds Decl. ¶ 14). If a student teacher fails to meet this requirement on student teacher evaluations, the student's progress is immediately reviewed by university personnel and the student may subsequently be removed from the student teaching placement. (Pl. Dep. pp. 168-69; Reynolds Decl. ¶ 16). The University maintains these standards to provide the students at the host school a quality education. (Reynolds Decl. ¶ 16).

One tool utilized in evaluating student teaching is set forth in "The Conceptual Framework: A Learning and Leadership Model," which is located in the Student Teaching Handbook. (Pl. Dep. p. 167; Ex. N, p. 8). Six areas are evaluated in the Conceptual Framework: democracy and community, habits of mind, pedagogy, knowledge, experience, and leadership. (Pl. Dep. Ex. N, p. 8). The university supervisor, cooperating teacher, and the student teacher all independently evaluate each areas of the Conceptual Framework. (Pl. Dep. Ex. N, pp, 3, 8). The university supervisor, cooperating teacher, the student teacher, and the Director of Field Services all have input in the student's grade throughout the semester. (Pl. Dep. Ex. N, pp, 3, 8). However, the Director of Field Services has the ultimate authority and responsibility for assigning a student teacher's grade. (Reynolds Decl. ¶ 17). At

all times relevant, Laura Reynolds was the Director of Field Services.

The University supervisor completes a written student teacher evaluation form each time he observes a student teacher's lesson. (Reynolds Decl. ¶ 13). Student teachers are evaluated on several Rubric Levels and are assigned points in each of those levels. (Reynolds Decl. ¶ 13). A student will receive one point if his performance is "Unsatisfactory," two points if his performance is "Basic," three points if his performance is "Proficient," and four points if his performance is "Distinguished." (Pl. Dep. pp. 149, 151, 186; Ex. H, p. 1; Ex. I, p. 1; Reynolds Decl. ¶ 13). Half points may also be assigned in a Rubric Level if needed. (Pl. Dep. pp. 149, 151, 186; Ex. H, p. 1; Ex. I, p. 1; Reynolds Decl. ¶ 13). In total, ten standards are evaluated. (Pl. Dep. Ex. H, pp. 1-3; Reynolds Decl. ¶ 13).

The written evaluation form contains a section for reflections by the student teacher, wherein he should comment on the strong points of his experience, how he believes he has met his teaching objectives for that experience, how he could and did assess student learning in that experience, and what he might do differently in completing that experience again. (Pl. Dep. pp. 150-157; Ex. H, p.3; Ex. I, p. 3). A section is also provided for the university supervisor's comments, and a final section is provided for the student teacher's reflection on the critique of the evaluator.

(Pl. Dep. p. Ex. H, p.4).  The student teacher and university supervisor must sign the evaluation form.  (Reynolds Decl. ¶ 13). The student teaching experience is graded on a Pass/Fail basis. (Pl. Dep. Ex. N, p. 6; Reynolds Decl. ¶ 15).  If a student received an "F" for the student teaching experience, the student must repeat the student teaching experience in its entirety.  (Pl. Dep. Ex. N, p. 6; Reynolds Decl. ¶¶ 17, 21).

### Plaintiff's Experience as a Student Teacher at Elmhurst

Plaintiff spent the first couple of weeks observing Pettis's classroom and orienting himself to the school.  (Pettis Aff. ¶ 5). Then, for the next six weeks, Plaintiff had primary responsibility for teaching Pettis's classes.  (Pettis Aff. ¶ 5).  During the time Plaintiff took over instruction of her classes, Pettis was sometimes present and sometimes not present.  (Pettis Aff. ¶ 5).

On September 14, 2008, Hissong was notified that a concerned parent had contacted Dr. Wendy Robinson, the Superintendent of FWCS, about allegations that Plaintiff was verbally abusing students in a U.S. History class.  (Hissong Aff. ¶ 4).  Hissong investigated this allegation and, during the course of his investigation, met with Plaintiff and inquired about the complaint. (Hissong ¶¶ 4-5).  Plaintiff asked for the identity of the complainant, but Hissong declined to give him that information. (Hissong Aff. ¶ 5).  Ultimately, Hissong could not substantiate the

allegations against Plaintiff and, thus, took no action against him. (Hissong Aff. ¶ 6).

On September 15, 2008, Fecher, the University supervisor, observed Plaintiff's social studies lesson and evaluated Plaintiff for the first time. (Pl. Dep. p. 149; Ex. H, p. 1). Plaintiff's overall numerical evaluation averaged 2.0, which is less that the 2.5 required to pass the student teaching assignment. (Pl. Dep. p. 186; Ex. H at 1-4; Reynolds Decl. ¶ 20). On Fecher's evaluation, Fecher noted that Plaintiff needed to employ a variety of instructional strategies rather than one approach, such as the lecture method, to engage students in the learning process. (Pl. Dep. p. 186; Ex. H at 1-4; Reynolds Decl. ¶ 20). Fecher was critical of other aspects of Plaintiff's performance as well. (Pl. Dep. p. 186; Ex. H 1-4). Plaintiff acknowledged Fecher's critiques and stated that he was trying to improve in those areas. (Pl. Dep. Ex. H at 4).

Sometime around September 18, 2008, when Plaintiff was supervising a class, a student showed him some objectionable drawings made by another student. (Pl. Dep. pp. 58-59). The drawings included caricatures of Plaintiff and sexual themes: in one, Plaintiff was depicted having sex with one of the students' mother, who was depicted as saying, "Nigger get out of here." (Pl. Dep. Ex. D). While Plaintiff considered the drawings disrespectful, he did not "blow up" over them. (Pl. Dep. p. 62).

In fact, he acknowledged that he had "probably done drawings worse than that" himself. (Pl. Dep. p. 62). At the end of the period, Pettis entered the classroom and asked Plaintiff to give her the drawings. (Pl. Dep. p. 64; Pettis Aff. ¶ 6). Plaintiff hesitated because he did not want the students to be punished. (Pl. Dep. p. 64-65).

Pettis was "not pleased at the drawings or the students" and referred the matter to the Assistant Principal's office for handling. (Pl. Dep. p. 65; Ex. D; Pettis Aff. ¶ 6). Pettis asked Plaintiff not to "baby" the students, because "[t]hey know what is expected of them as juniors and seniors and students." (Pl. Dep. Ex. D).

On September 19, 2008, Pettis learned that a parent of an Elmhurst student complained to Ron Wilkins, Elmhurst's guidance counselor, that Plaintiff had not allowed her child to re-take a quiz that the child had missed while taking the ISTEP exam. (Pettis Aff. ¶ 7). Pettis intervened and allowed the student to take the test, as children were being allowed to make up work missed for the ISTEP. (Pettis Aff. ¶ 7).

On September 29, 2008, Pettis completed the Cooperating Teacher Student Teaching Midterm Evaluation of Plaintiff, which followed the same format as Fecher's evaluation. Plaintiff scored a 1.9 on this evaluation. (Pl. Dep. pp. 152-53; Ex. J 1-4; Reynolds Decl. ¶ 20). Pettis noted that Plaintiff failed to engage

students with active questioning, had difficulty with classroom management, lectured too much and needed to work on establishing connections with his students. (Pl. Dep. Ex. J 1-4). Pettis advised Plaintiff on how he could improve these areas and suggested Plaintiff talk with veteran teachers. (Pl. Dep. Ex. J at 3). Although given the opportunity to comment on the evaluation, Plaintiff did not complete the reflection portions.

On October 1, 2008, Fecher completed his second evaluation of Plaintiff. (Pl. Dep. p. 151; Ex. I at 1-4; Reynolds Decl. ¶ 20). Plaintiff scored a 2.1 on this evaluation. (Pl. Dep. Ex. I at 1-4). Fecher noted a number of concerns regarding Plaintiff's teaching strategies and commented that Plaintiff needed to improve. (Pl. Dep. Ex. I at 1-4).

On October 8, 2008, the parent who complained about the missed quiz e-mailed Mr. Wilkins to complain that Plaintiff was not allowing students to ask questions in class. (Pettis Aff. ¶ 8; Ex. A).

The University decided to remove Plaintiff from his student teaching placement at Elmhurst, citing Plaintiff's cumulative average score on student teaching evaluations, which fell below the required numerical level of 2.5. (Reynolds Decl. ¶¶ 21-22). On October 14, 2008, Nichols, the head of the Educational Studies department, informed Hissong of that decision. Before receiving the call from Nichols, none of the FWCS defendants were award that

Plaintiff's teaching assignment would be terminated, nor were they involved in the decision to terminate the assignment. (Hissong Aff. ¶ 9; Pettis Aff. ¶ 9; Bragg Aff. ¶ 4).

Nichols met with Plaintiff at Elmhurst on that same day to inform Plaintiff of his removal from the program, and escorted Plaintiff from the premises pursuant to University policy. (Pl. Dep. p. 172).

After being removed from the program, Plaintiff sent an e-mail to Fecher stating that he had been removed from his student teaching placement. (Pl. Dep. pp. 174, 179-180; Ex. O). Fecher responded to Plaintiff advising him to request a meeting with Nichols and Reynolds to discuss the situation. (Pl. Dep. pp. 174, 179-180; Ex. O). Plaintiff instead opted to initiate litigation.

Notably, at some time during Plaintiff's student teaching at Elmhurst, Plaintiff alleges that Pettis "allowed a 'noose rope' to hang on an overhead projector screen in front of her classroom." (Cmplt ¶ 2). The handle on the projector screen broke one day when a student pulled down too hard. (Pl. Dep. p. 79). Plaintiff let Pettis know, and Pettis said she would take care of it and call the maintenance man. (Pl. Dep. p. 79). After that discussion, Plaintiff arrived back in the classroom and saw a string dangling from the handle on the screen, which Plaintiff characterized as a "noose rope." (Pl. Dep. p. 79; Exs. E and F). The string enabled someone to pull the screen down without having to stand on a chair,

but Plaintiff claims that is had a noose-type knot as well. (Pl. Dep. p. 79).

Plaintiff thought that the string was inappropriate, so he took it down and put it in his bag. (Pl. Dep. p. 79). When Pettis arrived back to the classroom, she asked Plaintiff where the string was. (Pl. Dep. p. 79). He responded by telling her that, "[r]opes for many groups is an omen. You know, it doesn't – it's not appropriate." (Pl. Dep. pp. 79-80). Pettis then clipped the noose-like knot off so that the string simply had a loop on it. (Pl. Dep. pp. 79-80). Plaintiff was ok with the string hanging on the projector screen after the knot was cut off. (Pl. Dep. pp. 80-81). Plaintiff does not know who put the string up in the first place. (Pl. Dep. pp. 80-81).

## Motion to Strike

Plaintiff has attached a number of evidentiary materials in opposition to Defendants' motion for summary judgment, which he has failed to identify. These materials consist of what appears to be a 1974 Equal Employment Opportunity Commission determination, various academic awards and letters, an e-mail communication from a parent, a printout from a web site regarding Chad Hissong's salary, and a letter from the University regarding Plaintiff's student teacher placements. Defendants have moved to strike these documents, arguing they are unauthenticated, improperly designated

and irrelevant.

"Supporting materials designed to establish issues of fact in a summary judgment proceeding 'must be established through one of the vehicles designed to ensure reliability and veracity – depositions, answers to interrogatories, admissions and affidavits. When a party seeks to offer evidence through other evidence through other exhibits, they must be identified by affidavit or otherwise made admissible in evidence.'" *Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1987)(quoting *Martz v. Union Labor Life Ins. Co.*, 757 F.2d 135, 139 (7th Cir. 1985)).

The documents Plaintiff has submitted are unauthenticated and subject to being stricken on that basis. Notably, even in responding to the instant motion to strike, Plaintiff sought only to defend his submission of deficient materials rather than rehabilitate them through a process of identification. As the parties are aware, pro se complaints are more liberally construed than complaints drafted by attorneys. However, there is no less formidable test for accepting materials as admissible evidence to create a genuine issue of material fact. *Averhart v. Arredondo*, 773 F.2d 919 (7th Cir. 1985)(noting that the generous treatment afforded to pro se litigants does not exempt them from both the substantive and procedural rules of law and does not authorize a separate set of rules for them). Thus, a pro se party is held to the same standard as a party represented by counsel. Plaintiff

has not met that standard.  Thus, this Court can not consider the attached materials.  Plaintiff should not feel too prejudiced by this ruling, though, as the materials would not create a genuine issue of material fact even if considered.

As a result, Defendants' motion to strike is **GRANTED**.[1]


Motions for Summary Judgment

    Summary judgment standard

The standards that generally govern summary judgment motions are familiar.  Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *Nucor Corp. v. Aceros Y Maquilas De*

---

[1]Notably, the FWCS Defendants did not seek to strike Plaintiff's attached documents.  Nevertheless, even if these documents were considered, the submitted documents are not material to the case.  That is, summary judgment would be appropriate even considering Plaintiff's inadmissible materials.

*Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an

essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate.

### FWCS Defendants' Motion for Summary Judgment

Plaintiff has brought a number of section 1983 claims against Fort Wayne Community School employees, Hissong, Bragg, and Pettis (collectively "FWCS Defendants"), based on: (1) the termination of his student teaching assignment; (2) Hissong's refusal to tell him which parent e-mailed a complaint about him; (3) Pettis's reaction to the incidents involving the illicit drawings and the noosed rope; and (4) Bragg's role in the chain of command at Elmhurst when all of these things occurred. Although not clearly enunciated, it appears Plaintiff alleges a violation of his equal protection rights and claims to have been denied procedural due process.

To state a claim under Title 42 U.S.C. section 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted); *see also Cunningham v. Southlake Ctr. for Mental Health*, 924 F.2d 106, 107 (7th Cir. 1991).

Plaintiff does not specify whether he has sued the FWCS Defendants in their official or individual capacities. As such, this Court, in all deference to liberally construing Plaintiff's

complaint, will examine both theories. *Hill v. Shelander*, 924 F.2d 1370, 1373 (7th Cir. 1991).

## Official Capacity Claims

When governmental employees are sued in their official capacities, the suit is treated as if the plaintiff has sued the municipality itself. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). The claims stated against the FWCS Defendants in their official capacities as employees of the FWCS are really claims against the municipality itself. When a plaintiff brings suit against a municipality under section 1983, the plaintiff must base his injury on the existence of an unconstitutional policy or custom of the municipality in order to survive summary judgment. *St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[local] governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights"); *see also Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978); *Strauss v. City of Chicago*, 760 F.2d 765, 766-67 (7th Cir. 1985) (confirming dismissal of complaint where plaintiff failed to properly allege policy of municipality). An isolated decision by a municipal employee or official constitutes an official policy only if that official has "final policymaking authority" for the challenged act. *Partee v. Metropolitan School District of Washington Township*, 954 F.2d 454,

456 (7th Cir. 1992).

Plaintiff has made no such allegation in his Complaint or in response to the instant motions. Therefore, Plaintiff's claims against the FWCS Defendants in their official capacities, fail as a matter of law.

<u>Individual Capacity Claims</u>

Government employees performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Eversole v. Steele*, 59 F.3d 710, 717 (7th Cir. 1995) (citing *Marshall v. Allen*, 989 F.2d 787, 791 (7th Cir. 1993); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is intended to protect "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1986).

A 2-part test determines whether government employees, such as the FWCS Defendants, are entitled to qualified immunity in a civil suit under section 1983. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The threshold inquiry is whether, taken in the light most favorable to Plaintiff, the facts alleged show the defendant's conduct violated a constitutional right. *Id.* at 201 (citing *Siegert v. Gilley*, 500 U.S. 226 (1991)). If the facts as alleged

reveal no constitutional violation, the inquiry ends and the government employee will prevail on the merits of the case. *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding if there is no constitutional violation, there can be no liability on the part of the individual or the government body); *Eversole*, 59 F.3d at 717 ("[t]he first part of this two-part test is a threshold issue that can defeat entirely a claim of qualified immunity. If a plaintiff's allegations, even when accepted as true, do not state a cognizable violation of constitutional rights, then the plaintiff's claim fails.").

If, on the other hand, the facts alleged would amount to a constitutional violation, the Court next examines "whether the right was clearly established." *Saucier*, 533 U.S. at 201. The rationale behind this is "[i]f the law did not put the [defendant] on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* at 202 (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "The relevant inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [defendant] that his conduct was unlawful in the situation the [defendant] confronted." *Payne v. Pauley*, 337 F.3d 767, 775-76 (7th Cir. 2003) (citing *Saucier*, 533 U.S. at 202). During this 2-step evaluation process, the Court will bear in mind that the doctrine of qualified immunity leaves "ample room for mistaken judgments." *Malley v. Briggs*, 475

U.S. 335, 343 (1986).

It must first be pointed out that Plaintiff has failed to submit any admissible evidence in support of his arguments. In Plaintiff's memorandum, he sets out that he believes that Defendants do not want him to teach in the public school system and further also alleges a conspiracy between all of the Defendants in this case. The problem with Plaintiff's claims, at this stage, is that they are not supported by admissible evidence and, therefore, they cannot be considered by the Court. Fed.R.Civ.P. 56(e)(2); *Stein v. Ashcroft*, 284 F.3d 721, 727 (7th Cir. 2002); *Lloyd v. Rolls-Royce Corp.*, 2003 WL 23101791, *2 (2003). Despite Plaintiff's sincerely held belief that the FWCS Defendants wanted him terminated and were involved in that termination, he was required to present evidence to substantiate those claims. This was explained to Plaintiff by the FWCS Defendants in the "Notice to Pro Se Litigant" on June 30, 2009. (DE# 28).

Equal Protection

To the extent Plaintiff makes an equal protection claim based on his race, he must set out a prima facie case of discrimination against the Defendants or it fails as a matter of law. To do this, a plaintiff must demonstrate that he: (1) is a member of a protected class; (2) is otherwise similarly situated to members of the unprotected class; (3) suffered an adverse action; (4) was

treated differently from members of the unprotected class; and (5) the defendants acted with discriminatory intent. *McPhaul v. Board of Com'rs of Madison County*, 226 F.3d 558, 564 (7th Cir. 2000).

Plaintiff's equal protection claim fails for a number of reasons. First, Plaintiff points to no similarly situation individuals who were treated differently or more favorably than himself. It is Plaintiff's burden to point to specific similarly situated student teachers to establish that those similarly situated students were treated more favorably than himself. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 494 (7th Cir. 2000). Plaintiff failed to establish this element of his prima facie case. In addition, there is no evidence in the record supporting the notion that the FWCS Defendants acted with any discriminatory intent towards Plaintiff. Thus, Plaintiff's equal protection claim fails.

### Due Process

Plaintiff also claims that the FWCS Defendants denied him procedural due process in his termination from his student teaching assignment at Elmhurst. As a threshold matter, after examining the admissible evidence in this case, along with the submitted arguments, this Court is convinced that Plaintiff does not have any property right in his student teaching assignment. *San Antonio Indep. Sch. Dist. V. Rodriguez,* 411 U.S. 1, 28 (1973); *Hafhill v.*

*Northeast School Corp.*, 472 F.3d 496, 500 (7th Cir. 2006); *Swift v. Seisel*, No. 01-2691, 2002 WL 1585617 (E.D. La. July 15, 2002); *Lucas v. Hahn*, 648 A.2d 839, 841-42 (Vt. 1994). When a plaintiff brings an action under section 1983 for procedural due process violations, he must show that he wad deprived of a constitutionally protected interest in life, liberty or property without due process. *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Because Plaintiff has not shown that he has been deprived of a constitutional liberty or property interest, his procedural due process claim fails. *Id.*

Even if Plaintiff had a (clearly established) constitutional right in his student teaching assignment, the undisputed evidence shows that none of the FWCS Defendants could be said to have violated those rights because none of the FWCS Defendants knew or played a role in the decision to terminate Plaintiff from his student teaching assignment. See *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)(noting that defendant must be personally involved in deprivation to be liable in section 1983). The only FWCS Defendant that had any effect on Plaintiff's student teaching coming to an end was Pettis, as she provided evaluations of his classroom capabilities. Although Pettis evaluated Plaintiff, there is no evidence that the evaluation was inaccurate or motivated by any illegal animus.

In addition, Hissong's refusal to give Plaintiff the name of

the complaining parent violated no constitutional right. That complaint was never substantiated and did not play a role in Plaintiff's termination as a student teacher.

It cannot go unmentioned that nothing else about the FWCS Defendants actions or Pettis's reaction regarding either the drawing or the noosed rope violated Plaintiff's constitutional rights. Although Plaintiff complains about Pettis's actions regarding certain students' drawings and a noose that was removed by Pettis, he fails to identify any constitutional right violated by these actions. Indeed, Plaintiff admitted that he was not offended by the drawings and Pettis removed the noose-knot of the string, when Plaintiff brought it to her attention.

As a final point, Bragg cannot be held liable merely because of his role as an assistant principal. *Lanigan v. Village of East Hazel Crest, Ill.,* 110 F.3d 467, 4477. (7th Cir. 1999). The doctrine of respondeat superior cannot be used to impose liability and liability for a supervisor will only be imposed if he had knowledge of the subordinate's conduct and approved of the conduct. *Id.* Here, there is no evidence that any of Bragg's subordinates violated any of Plaintiff's constitutional rights. Thus, the claim against Bragg based on supervisor liability must fail.

What the evidence shows is that no FWCS Defendant had any discriminatory animus towards Plaintiff and, further, that no FWCS Defendant was unlawfully involved in his student teaching

assignment being terminated. Accordingly, there is no genuine issue of material fact and the FWCS Defendants are entitled to judgment as a matter of law. As such, their motion for summary judgment must be granted.

### Fecher's and Nichols's Motion for Summary Judgment

Plaintiff alleges Fecher and Nichols violated his civil rights under 42 U.S.C. section 1983, arguing that Fecher and Nichols denied him due process and equal protection under the Fourteenth Amendment to the U.S. Constitution by terminating him from the University's student teaching program. Again, Plaintiff does not specify whether he is suing Defendants in their individual or official capacities.

### Official Capacity

As discussed above, suits against government employees in their official capacities are essentially suits against the municipality itself. *See Graham*, 473 U.S. at 165-66. The claims stated against the these Defendants in their official capacities as employees of the University are really claims against the University itself. When a plaintiff brings suit against a municipality under section 1983, the plaintiff must base his injury on the existence of an unconstitutional policy or custom of the municipality in order to survive summary judgment. *Praprotnik*, 485

U.S. at 122.  An isolated decision by a municipal employee can constitute an official policy only if that official has "final policymaking authority" for the challenged act.  *Partee*, 954 F.2d at 456.  Plaintiff has made no such allegation in his Complaint or in response to the instant motion.  Therefore, Plaintiff's claims against Fecher and Nichols in their official capacities, fail as a matter of law.

And, to the extent that an official capacity claim can be made against the University, the University would enjoy immunity under the Eleventh Amendment to the U.S. Constitution. *Kashani v. Purdue University*, 813 F.2d 843 (7th Cir. 1987); *Shannon v. Bepko*, 684 F.Supp. 1465, 1475 (S.D. Ind. 1988).  Therefore, any claims against the University  due to the Defendants being sued in their official capacities fail as a matter of law.

<u>Individual Capacity</u>

<u>Equal Protection</u>

Plaintiff alleges that both Fecher and Nichols violated his right to equal protection under the Fourteenth Amendment to the U.S. Constitution as a result of being removed from the University's student teaching program.

Again, to succeed in his equal protection claim, Plaintiff must set out a prima facie case of discrimination against the Defendants or it fails as a matter of law.  To do this, a plaintiff

must demonstrate that he: (1) is a member of a protected class; (2) is otherwise similarly situated to members of the unprotected class; (3) suffered an adverse action; (4) was treated differently from members of the unprotected class; and (5) the defendants acted with discriminatory intent. *McPhaul v. Board of Com'rs of Madison County*, 226 F.3d 558, 564 (7th Cir. 2000).

Concerning the first prong, there is no question Plaintiff, an African-American, is a member of a protected class. However, that is the only prong met. There is no evidence that Plaintiff was treated differently than a similarly situated student teacher because of his race. A similarly situated individual is one directly comparable "in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Plaintiff has not even attempted to point to a similarly situated participant of the University's student teaching program that was treated more favorably than he was. *See O'Connor v. Chicago Transit Authority*, 985 F.2d 1362, 1371 (7th Cir. 1993). It is Plaintiff's burden to point to specific similarly situated student teachers to establish that those similarly situated students were treated more favorably than himself. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 494 (7th Cir. 2000). Plaintiff failed to establish this element of his prima facie case.

It is also Plaintiff's burden to raise a question of material fact that Defendants acted with discriminatory intent. Plaintiff

presents no evidence to indicate that the reason his student teaching role was terminated was motivated by any reason other than Plaintiff's failing to adequately perform as a student teacher. Notably, Plaintiff does not allege that the process by which he was evaluated or the criteria applied to determine a student teacher's grade was affected by race. Plaintiff has failed to show the decisions or any of the teaching surveys were motivated by any discriminatory animus. *Nabozny v. Podlesny*, 92 F.3d 446, 453 (7th Cir. 1996) (internal citations omitted). Consequently, Plaintiff has failed to establish a prima facie violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Therefore, this claim must fail.

<u>Due Process</u>

As discussed above, when a plaintiff brings an action under section 1983 for procedural due process violations, he must show that he was deprived of a constitutionally protected interest in life, liberty or property without due process. *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Because Plaintiff has not shown that he has been deprived of a constitutional liberty or property interest, his procedural due process claim fails. *Id.*

Even if Plaintiff possessed a (clearly established) constitutionally protected property interest in completing the student teaching placement at Elmhurst, he was afforded the

requisite process that was due. Notably, Plaintiff did not seek any more process than was afforded; he never sought a full hearing. In any event, academic decisions are typically left to academic channels and universities have a wide range of discretion in making those decisions. *Hennessy v. City of Melrose*, 194 F.3d 237, 250 (1st Cir. 1999; *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 215 (1985). Consequently, a full hearing is not typically necessary and, instead, the Constitution simply requires that an academic decision be carefully and deliberately made. *Board of Curators of University of Missouri v. Horowitz,* 435 U.S. 78, 90 (1978).

The decision to remove Plaintiff from his student teaching placement at Elmhurst was a purely academic decision. The undisputed evidence showed that Plaintiff failed to meet the University's requirements to continue teaching due to his sub-par student teaching evaluations. Plaintiff was given the opportunity to comment on those evaluations. In addition, there is no evidence or argument that those evaluations were the product of any illegal animus. Rather, the evaluations were based on the University's established standards. As a result, the due process claim fails too.

CONCLUSION

For the reasons set forth above, Defendants' motions are **GRANTED**. Accordingly, the clerk is **ORDERED** to enter judgment on behalf of Defendants and against Plaintiff. The clerk is further **ORDERED** to close this case.

DATED:  December 22, 2009                    /s/RUDY LOZANO, Judge
                                              United States District Court